## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNIÓN DE PERIODISTAS, ARTES GRÁFICAS Y RAMAS ANEXAS<br><br>Plaintiff,<br><br>v.<br><br><br>LIBERMAN MEDIA GROUP, LLC A/K/A TELEONCE<br><br>Defendant. | CASE NO. 3:25-cv-_____<br><br><br>RE: Vacatur of Labor Arbitration Award under Section 301 of the Labor Management Relations Act |

## PETITION TO VACATE ARBITRATION AWARD

**TO THE HONORABLE COURT:**

**COMES NOW** Plaintiff Unión de Periodistas, Artes Gráficas y Ramas Anexas (the "Union") through the undersigned counsel and very respectfully moves this Court to vacate a certain Arbitration Award issued in the matter of <u>Unión de Periodistas, Artes Gráficas y Ramas Anexas y Teleonce</u>, No. A-25-673 (the "Award") before the Puerto Rico Department of Labor and Human Resources' Bureau of Conciliation and Arbitration (the "Bureau") for the following reasons.

### I.    PRELIMINARY STATEMENT

The issue at hand is clear cut and simple: does an employer who unilaterally changes union employees' health insurance plans less than a year into a collective

1

bargaining agreement, by increasing certain costs and fees (some by more than 100%), breach the agreement? The answer should be an obvious yes, especially when the agreement in question required prior notice to and ratification by the Union before any new health insurance plan could be implemented.

Notwithstanding, the Award in question resolved the opposite, premising its rationale on a convoluted and untenable rationale that, since the "only thing" that changed were the costs borne by the employees—we repeat, in some cases by more than 100%—the insurance in question remained substantially the same. This rationale is defective due to three principal reasons. First, it disregards stipulations of fact by the parties that the unilateral changes entailed changes to *insurance coverage* as well. Second, the rationale is in no way supported by the text of the CBA in question, given that the CBA does not provide any exceptions whatsoever to the notice-and-ratification requirements. Instead, the Award impermissibly strikes these requirements from the CBA, thereby impermissibly modifying it. Finally, the Award offends applicable law, as it sanctions and condones a flagrant violation of the employer's duty to bargain.

For these reasons, and as will be explained below, the Union respectfully asks that the Award in question be vacated.

## II.    THE PARTIES

Plaintiff Unión de Periodistas, Artes Gráficas y Ramas Anexas (the "Union") is an unincorporated labor organization representing a bargaining unit of Teleonce employees,

2

which is more specifically detailed in Article 1 of the parties' Collective Bargaining Agreement.

Defendant Liberman Media Group, LLC a/k/a Teleonce (the "Employer") is a Puerto Rico limited liability company, with its principal place of business in Puerto Rico.

Both the employees represented by the Union and the Employer are involved in an industry affecting commerce.

### III.    JURISDITIONAL STATEMENT

This Petition is an action to vacate an arbitration award between the Employer and the Union, arising from a mandatory grievance arbitration clause in the Collective Bargaining Agreement by and between them.

Therefore, this Court has original jurisdiction over this petition pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and the federal question statute, 28 U.S.C. § 1331. See, e.g., Katir v. Columbia Univ., 821 F. Supp. 900, 901 (S.D.N.Y. 1993), aff'd, 15 F.3d 23 (2nd Cir. 1994) (holding that "[a]n action to vacate an arbitration award falls within" Section 301) (citation omitted); see also Santiago-Sánchez v. Gate Eng'g Corp., 193 F. Supp. 2d 392, 395 (D.P.R. 2002) (noting it to be "well settled" that an action to enforce an arbitration award arises under Section 301) (citing United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593 (1960)).

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) & (2), given that the Employer is a resident of this District and the majority of relevant events occurred within this District.

## IV.    STATEMENT OF THE CASE

### a.    The Parties reached an agreement, on which the Employer then reneged.

In 2017, the parties executed an initial Collective Bargaining Agreement (the "2017 CBA") valid until 2020 and later extended to 2023. **[Exhibit 1**[1]] Where relevant, Article 37 of the 2017 CBA governed the terms and conditions of the health insurance that the Employer would extend to the Union's members. This article also included a table establishing caps on employees' copays and deductibles under any health insurance to be provided by the Employer.

The parties later amended Article 37 through a Stipulation dated May 21, 2021. Through this Stipulation, the Union agreed that employees hired after May 21, 2021 would receive the same health insurance as non-Union employees. Therefore, until the end date of the 2017 CBA, Union employees were subject to a two-tier health insurance system, which depended on their hire dates. [**Exhibit 2**]

In 2023, as the parties were negotiating a successor agreement to the 2017 CBA, the Employer proposed amending Article 37 by striking its table, thereby placing all Union employees under the same health insurance coverage. In parallel, the Employer bargained with the Union on the extent of coverage and benefits to be provided under the new health insurance plan, including copays and deductibles. In fact, during these negotiations, the Employer provided documents that listed all benefits, deductibles, and

---

[1] Exhibits 1 through 8 were the Exhibits submitted during the arbitration hearing and follow the same numbering in this Petition.

copays for its proposed health insurance plan. Specifically in response to and relying on these documents, the Union not only acceded to the new health insurance plan but also accepted the Employer's proposal to strike the "table" from the successor to Article 37 of the 2017 CBA. Therefore, under the new CBA, all Union employees' health insurance would now be uniform and no longer subject to the two-tier regime that began with the 2021 Stipulation.

Having reached this agreement (among others), in 2024, the parties eventually executed a successor agreement to the 2017 CBA (the "2024 CBA"). Given that the only amendments to Article 37's successor were the striking of the table, the remainder thereof remained substantially the same.[2] Therefore, the Employer was contractually beholden to ensure that Union employees were provided with the agreed-upon health insurance or to be provided with another plan with identical or greater benefits during the lifetime of the 2024 CBA. [**Exhibit 3**]

Notwithstanding, in November 2024, the Employer contacted the Union to meet and engage in midterm bargaining about possible changes to Union employees' health insurance. The Employer's contact responded to the fact that, pursuant to the 2024 CBA, any change to Union employees' health insurance had to be notified to and ratified by the Union. Just days prior to the meeting, the Employer then cancelled it.

However, on December 23, 2024, less than a year after the 2024 CBA had gone into effect, the Employer announced that it would unilaterally change all employees' health

---

[2]    In fact, the successor article to Article 37 is also numbered Article 37.

insurance. The Employer's decision had not even been subject to bargaining, nor did the Employer provide the Union with notice, prior to its announcement. Aside from the Employer's complete departure from bargaining, the health insurance it intended to unilaterally adopt resulted in multiple increase in copayments, deductibles, and employees' contributions, as evidenced by two table-summaries attached to its December 23 notice. [**Exhibit 6**][3]

The first table-summary, regarding employees' monthly contributions, reflects year-over-year increases from slightly over thirty percent (30%) to nearly ninety percent (90%):

| Coverage | 2024 Monthly Contribution | 2025 Monthly Contribution | Year-over-year Increase |
|---|---|---|---|
| Individual | $45.00 | $84.00 | $39.00 (86.67% increase) |
| Employee + partner | $99.00 | $142.00 | $43.00 (43.43% increase) |
| Employee + children | $81.00 | $124.00 | $43.00 (53.09% increase) |
| Family | $131.00 | $174.00 | $43.00 (32.82% increase) |

The second table-summary, detailing changes in deductibles and copays, included increases of over 100% on certain line items:

| Item | 2024 Copay / Deductible | 2025 Copay / Deductible | Year-over-Year Increase |
|---|---|---|---|
| Hospital (Preferred) | $35 | $100 | $65 (85.71%) |
| Hospital (Non-Preferred) | $75 | $200 | $125 (66.67%) |
| Emergency Room (Accident) | $25 | $50 | $25 (100%) |

---

[3] Refer to **Exhibits 4 and 5** that include the health insurance policies in place for 2024 and 2025, respectively.

| Laboratories | 25% of the cost | In – 30% of the cost<br><br>Out – 45% of the cost | In – the 5% percentage increase is a 20% YoY increase.<br><br>Out – the 20% percentage increase is an 80% YoY increase. |
|---|---|---|---|
| X-Rays | 25% of the cost | In – 30% of the cost<br><br>Out – 45% of the cost | In – the 5% percentage increase is a 20% YoY increase.<br><br>Out – the 20% percentage increase is an 80% YoY increase. |
| Prescription (Upfront Fee) | $0 | $75 | This is an entirely new charge. |
| Prescription (Generic) | $5 | $7 | $2 (40%) |
| Prescription (Preferred Brand) | $15 | 25% of the cost, with a $25 minimum | $10 (66.67%)*<br><br>*Based solely on the minimum, the real increase may be higher. |
| Prescription (Non-Preferred Brand) | $20 | 30% of the cost, with a $30 minimum | $10 (50%)*<br><br>*Based solely on the minimum, the real increase may be higher. |
| Prescription (Preferred Specialty) | 20% of the cost, capped at $150.00 | 20% of the cost, capped at $500 | $350 cap increase (133.33%) |
| Prescription (Non-Preferred Specialty) | 20% of the cost, capped at $150.00 | 20% of the cost, capped at $500 | $350 cap increase (133.33%) |
| 90 Days' Supply (Generic) | $10 | $14 | $4 (40%) |

| 90 Days' Supply (Preferred Brand) | $30 | 19% of the cost, with a $50 minimum | $20 (66.67%)*<br><br>*Based solely on the minimum, the real increase may be higher. |
| 90 Days' Supply (Non-Preferred Brand) | $60 | 30% of the cost, with a $90 minimum | $10 (66.67%)*<br><br>*Based solely on the minimum, the real increase may be higher. |

In response to the December 23 Notice, on December 26, 2024, the Union sent the Employer a letter advising that its decision breached the 2024 CBA and stressed that the change had not been discussed in any way with the Union. [**Exhibit 7**] The following day, the Employer replied, stating without any evidentiary support that it had not made a unilateral decision and, blatantly ignoring the rise in copays, deductibles, and employee contributions, declared that the new health insurance was substantially the same. [**Exhibit 8**]

**b. The Union requested grievance arbitration and proved that the Employer breached the 2024 CBA.**

Thereafter, and because the Employer had unquestionably reneged on and breached the 2024 CBA, the Union requested grievance arbitration before the Bureau, pursuant to Article 39 of the 2024 CBA. In its submission, the Union asked the Bureau to declare that the Employer had breached Article 37 of the 2024 CBA, to order the Employer to strictly comply with the 2024 CBA and to either reinstate the bargained health insurance plans or to provide equal or better coverage.

The arbitration hearing took place on March 18, 2025. The Union called two witnesses to the stand, Dennis Rivera-Bello ("Rivera"), a Union employee who worked as an exterior cameraman and General Steward of the Union, and Néstor Soto ("Soto"), the Union's Executive Secretary.

Rivera testified that in mid-November 2024, he spoke with Yesenia De León ("De León"), who at that time was the Employer's Director of Human Resources, because she had requested a meeting with him to discuss substantial changes to Union employee's health insurance plan that needed to be discussed with the Union. [**Exhibit 11, Page 9, line 6- 20**]. Although the meeting had been confirmed for December 20, 2024, it was later cancelled at the Employer's request. [**Exhibit 11, Page 10, line 4-22; Page 13, line 6-11**] The Employer told Rivera that it had "resolved" the health insurance issue and guaranteed there would be no changes. [**Exhibit 11, Page 13, line 6-11**]

However, Rivera testified that, on December 23, 2024, the Employer had sent an email to all employees with information about the changes to be implemented in the health plan, effective 2025. (**Exhibit #6**) [**Exhibit 11., Page 13, line 13-15**]. Motioning to Exhibit 6, Rivera stated that it included a table outlining employees' contributions under the 2024 and 2025 health insurance plans, reflecting a year-over-year increase. [**Exhibit 11, Page 13, line 17-22; Page 14, line 1-22; Page 15, Line 1-19**]

Additionally, regarding copays and deductibles, Rivera testified that there would be a substantial increase, as the hospital deductible would increase from $35 in 2024 to $100 in 2025. [**Exhibit 11, Page 15, line 1-3**]. Rivera also stressed that there would be

changes to copays for labs, X-rays, hospitalization, telehealth services, and other coverage areas. [**Exhibit 11, Page 15, line 14-19**]

Rivera stated that the most drastic change of all would be pharmacy benefits. [**Exhibit 11, Page 15, line 17-21**] Pharmacy deductibles drastically increased year-over-year, starting with medicine deductibles. [**Exhibit 11, Page 16, line 1-9**] As an example, Rivera mentioned an employee who took a heart medicine. In 2024, that employee's copay was $13.00, which then ballooned to $200.00 in 2025. [**Exhibit 11, Page 16, lines 3-9**] This is an increase of over 1300%.

Furthermore, Rivera averred that the new health insurance also includes an upfront payment system that had never before been present. [**Exhibit 11, Page 16, lines 3-22; Page 17, lines 1-14**] This system required each employee to make a flat payment of $75.00, just to benefit from the pharmacy coverage. [**Exhibit 11, Page 16, lines 3-22; Page 17, lines 1-14**] Rivera also mentioned another significant change in the new health insurance: employees who made monthly contributions had their contributions practically doubled. [**Exhibit 11, Page 17, lines 17-20**]

Moreover, Soto corroborated Rivera's claim about the unilateral change by the Employer to employees' health insurance. He stated that, were the Employer to implement any changes, it had to provide notice to the Union, who would then need to ratify it. [**Exhibit 11, Page 42, lines 14-22; Page 43, lines 1-6**] Notwithstanding, Soto averred that the Employer's changes were unilaterally imposed. [**Exhibit 11, Page 43, lines 3-22**] Soto also testified that the health insurance was inferior, different to, and

contrary to the health insurance that the parties had already bargained when executing the 2024 CBA. [**Exhibit 11, Page 46, lines 1-7; Page 43, lines 1-18**]

Soto stated that there was only one situation in which the Employer could transfer health insurance costs to the employees: when there is an increase in the cost of coverage and the increased cost of coverage exceeds $925.00. [**Exhibit 11, Page 47, lines 10-21; Page 48, Lines 1-3**] However, in this case, there had only been a slight increase from 2024 to 2025, for the same level of coverage, which increase did not exceed $925.00. [**Exhibit 11, Page 43, lines 16-22; Page 44, Lines 1-5**]

Soto did say that the 2024 CBA allows for a change in health insurance, but only when the Employer provides notice of a change and the change is equal to, or better than the existing insurance, but this change requires ratification by the Union. [**Exhibit 11, Page 43, lines 3-15; Page 46, Lines 1-7**] However, the Employer failed to comply with these requirements, because as Soto stated, the 2025 health insurance was drastically inferior. [**Exhibit 11, Page 46, Lines 1-7**] More importantly, the Employer never notified its proposal to the Union, who then did not ratify any such proposal. [**Exhibit 11, Page 45, lines 9-14; Page 49, lines 1-12; Page 60, Lines 6-8**]

More importantly, Soto stressed that the unilateral change in health insurance was also a unilateral change to the 2024 CBA, considering the amendments made to Article 37.[4] The health insurance in effect during 2024 was part of the negotiations leading up to the 2024 CBA. [**Exhibit 11, Page 44, lines 6-21; Page 45, lines 1-20**] Soto confirmed that

---

[4]    Soto participated in the negotiations of both the 2017 CBA and the 2024 CBA. [T. Page 40, lines 18-22]

Article 37 was amended, precisely by striking the table of copays and deductibles, in light of the health insurance plan that the Employer had proposed would be adopted and that the employees enjoyed during 2024. **[Exhibit 11, Page 44, lines 13-21; Page 45, Lines 1-8]**

Rivera also corroborated this point. Article 37, as it existed in the 2017 CBA, included a table of copays and deductibles. Notwithstanding, the Union agreed to eliminate this table for the version of Article 37 to be included in the 2024 CBA, after being presented at the bargaining table with another table of copays and deductibles by the Employer—corresponding to the health insurance that would be in place in 2024—and noting that there would be no substantial differences. [**Exhibit 11**, **Page 3**9**, lines** 16-**22; Page 40, line 1-13**] Rivera also testified that this new health insurance regime would be in place for the lifetime of the 2024 CBA, but the Employer unilaterally changed it less than one year into the 2024 CBA. **[Exhibit 11, Page 40, lines 11-17**]

Rivera's and Soto's testimony went unchallenged by the Employer, who simply did not call any witnesses. In fact, in its Award, the Bureau noted various facts stipulated by the parties, including that: (i) the Employer had unilaterally changed Union employee's health insurance; (ii) the changes to health insurance included increases for employees' contributions, copays and deductibles, and (iii) aside from the December 23, 2024 letter, the Employer provided no written communication to the Union to discuss the health insurance changes. Notwithstanding, the Bureau concluded that there was no change in the employee's health insurance, merely an increase in costs for each employee,

and held, with no sound reasoning, that the Employer did not breach the 2024 CBA.

[**Exhibit 10**]

## V.    REASONS FOR VACATUR

### a.  This Court may review the Award's legal conclusions *de novo*.

Generally, the review of an Arbitrator's award is narrow and deferential. Wheelabrator Envirotech Operating Servs. Inc. v. Mass Laborers District Council Local 1144, 88 F. 3d 40, 43 (1st Cir. 1996). Therefore, the role of the courts is ordinarily "limited in determining if the party that requests arbitration is commencing an action that on its face is governed by the agreement." United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598 (1960).

However, there are several exceptions to this general rule, such as when the award does not derive its essence from the CBA. Id. at 597. Additionally, an arbitration award ought to be vacated when its reasoning "is palpably erroneous that no judge or group of judges could conceive having made such a decision or it is erroneously based on a crucial supposition that it is not a fact." Challenger Caribbean Corp. v. Unión General de Trabajadores de P.R., 903 F. 2d 857, 861 (1st Cir. 1990).

Moreover, the parties to an arbitration agreement may contractually agree to expand judicial review of an arbitration award. Gateway Techs. Inc. v. MCI Telecommunications Corp., 64 F.3d 993, 995 (5th Cir.1995). For example, if the parties agree, a court may review an arbitration agreement's conclusions of law or findings of fact. See e.g., Lapine Technology Corp. v. Kyocera Corp., 130 F.3d 884, 887 (9th Cir.1997)

(reversing a district court's refusal to review an arbitration award, where the CBA allowed a court to vacate, modify, or correct an award "where the arbitrator's findings of fact are not supported by substantial evidence, or [. . .] where the arbitrator's conclusions of law are erroneous"). Where this expanded standard of review exists, the award's legal conclusions are reviewed *de novo*. Gateway Techs. Inc., 64 F.3d at 997; see also Syncor Int'l Corp. v. McLeland, 120 F.3d 262 (table), No. 96-2261, 1997 U.S. App. LEXIS 21248, at \*17-18 (4th Cir. Aug.11, 1997) (reviewing *de novo* an award's legal conclusions).

Although the First Circuit has not expressly adopted this standard, it has also held that the parties to an arbitration agreement may "displace" the default standard of review. P.R. Tel. Co. v. U.S. Phone Mfg. Corp., 427 F.3d 21, 31 (1st Cir. 2005). Nevertheless, both district courts within the First Circuit and the Supreme Court have adopted this standard. See respectively, New England Utils. v. Hydro-Québéc, 10 F. Supp. 2d 53, 64-65 (D. Mass. 1998); Autoridad de Edificios Públicos v. Unión Independiente de Empleados de la Autoridad de Edificios Públicos, 130 P.R. Dec. 983, 988 (1992) (noting that the parties' agreement that an arbitration award should "conform to law" "clear[s] the way for review by the court and for the eventual correction of legal errors").

In this case, the parties have agreed to an expanded standard of review. As noted, Article 39 of the 2024 CBA governs the parties' complaints and grievances procedures. Article 39, Section 9 provides that the arbitrator's decision shall be "final and binding upon the parties, as long as it conforms to law." Further, Article 39, Section 10 requires the arbitrator to "resolve in accordance with the provisions of this Agreement" and

expressly states that he or she has no "authority to amend it, add to it, remove from it, or modify it in any way."

Further, an award is reviewable to the extent that it contravenes public policy. <u>W. R. Grace & Co. v. Rubber Workers</u>, 461 U.S. 757, 766 (1983). Public policy, for example, includes the protections offered by the National Labor Relations Act. <u>Van Waters & Rogers, Inc. v. Int'l Bhd. of Teamsters</u>, 913 F.2d 736, 742 (9th Cir. 1990). Indeed, the Supreme Court has held that an award is owed deference only if the results are not repugnant to the NLRA. <u>Carey v. Westinghouse Elec. Corp.</u>, 375 U.S. 261, 270-71 (1964). Therefore, when an award is repugnant to the NLRA, "federal common law" would require a court to vacate such an award. <u>Gen. Warehousemen & Helpers v. Standard Brands, Inc.</u>, 579 F.2d 1282, 1294 (5th Cir. 1978) (Tuttle, J.); <u>see also</u> <u>Glendale Mfg. Co. v. Int'l Ladies' Garment Workers' Union</u>, 283 F.2d 936, 940 (4th Cir. 1960) (deeming an award "unenforceable," when enforcement would require the parties to commit an unfair labor practice); <u>Sperry Sys. Mgmt. Div., Sperry Rand Corp. v. NLRB</u>, 492 F.2d 63, 70 (2d Cir. 1974) ("[T]he Company could not have complied with the arbitrators' award without infringing upon the rights of the Vallejo employees in violation of § 8(a)(1) and (a)(2) of the Act, and the Union attempt to require it do so constitutes a failure to bargain collectively in violation of § 8(b)(3) of the Act.").

As will be argued below, the Award at issue is reviewable by this Court, and it should vacate the Award. For starters, the Award's legal conclusion that the Employer did not breach the CBA is palpably incorrect. Further, the Award's decision is tantamount

to an amendment of the parties' CBA, which exceeds the scope of authority delegated by the parties to the arbitrator. Lastly, the Award is repugnant to the NLRA, as it condones a flagrant abdication by the Employer of its legal duty to bargain with the Union.

> **b.    The Award's conclusion that the Employer did not breach Article 37 is palpably erroneous and contradicts the parties' stipulated facts.**

Section IV of the Award recollects the parties' stipulated facts. Stipulated Fact No. 2 acknowledges that the Employer "unilaterally changed the health insurance policy offered to its employees." **[Exhibit 10, p. 5, ¶2]** Per Stipulated Fact No. 4, aside from the December 23, 2024 notice, there was no other written communication to the Union to bargain this change. **[Exhibit 10, p. 5, ¶4]** Stipulated Fact No. 3 noted that the 2025 health insurance plan "included increases in the contributions, copays, and deductibles for employees." **[Exhibit 10, p. 5, ¶3]** Stipulated Fact No. 7 provided that the health insurance *coverage* is what changed. **[Exhibit 10, p. 5, ¶7]**

Notwithstanding these facts, the Award's decision is that the Employer did not breach Article 37, precisely because the *coverage* did not change, but rather the *cost* of coverage changed. Regardless of the merits of the Award's reasoning, that reasoning is palpably erroneous considering Stipulated Fact No. 7, wherein the parties stipulated that it was the *coverage* that changed. **[Exhibit 10, p. 5, ¶7]**

There exists a general principle that "stipulations of attorneys made during a trial may not be disregarded or set aside at will." Chao v. Hotel Oasis, Inc., 493 F.3d 26, 31 (1st Cir. 2007) (quoting T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995)). Indeed, pre-trial stipulations "are of course binding upon the signatories." Geremia v.

First Nat'l Bank, 653 F.2d 1, 5 (1st Cir. 1981) (citing Romero-Reyes v. Marine Enterprises, Inc., 494 F.2d 866, 868 (1st Cir. 1974)). In fact, these stipulations "stand as fully determined as if adjudicated at the trial." Romero-Reyes, 494 F.2d at 868 (quoting 3 Moore's Federal Practice ¶ 16.19).

 "[W]here a party makes an explicit and specific concession, practical reasons favor holding a party to such a concession. . ." United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011). Therefore, a party may be relieved from a stipulation only upon "good cause," which requires that there be good reason for relief and an absence of unfair prejudice upon the opposing party or the interests of justice. Chao, 493 F.3d at 32 (1st Cir. 2007) (quoting Am. Honda Motor Co. v. Richard Lundgren, Inc., 314 F.3d 17, 21 (1st Cir. 2002)). Notwithstanding, it is up to the party seeking relief from a stipulation to move for such relief and to do so with "due diligence." Gaztambide-Barbosa v. Torres-Gaztambide, 776 F. Supp. 52, 58 (D.P.R. 1991).

That was not the case here. The Employer agreed to Stipulated Fact No. 7. Neither at the Arbitration Hearing nor at any preceding time did the Employer seek relief from that stipulation. Further, **the Award did not grant any such relief <u>but instead included Stipulated Fact No. 7 as part of the findings of fact in this case</u>**.

Therefore, the Award was bound to the stipulation that there had effectively been a change in *coverage*, as that was precisely the fact stipulated by the parties. Its conclusion otherwise—that the change was merely a change in *costs* to the employees—is manifest, reversible error. Courts "cannot overlook or disregard stipulations which are absolute

and unequivocal." <u>L.P.S. v. Lamm</u>, 708 F.2d 537, 539 (10th Cir. 1983). Absent "manifest injustice," a trier-of-fact commits reversible error by disregarding an unequivocal stipulation, such as the one at hand. <u>Smith v. Blackburn</u>, 785 F.2d 545, 549 (5th Cir. 1986). Therefore, since the Award patently ignored Stipulated Fact No. 7, issued a patently contradictory finding, and relied on that contradictory finding to rule for the Employer, the Award should be vacated.

> ### c. The Award impermissibly amends the parties' CBA and unilaterally modifies the terms and conditions of employment.

The Award found that Article 37 does not require notice and ratification of a new health insurance plan, when the only change in the health insurance plan is in terms of costs to the employees. That finding is entirely at odds with the text of Article 37, the parties' history of bargaining, and unilaterally modifies the terms and conditions of employment.

The notice and ratification requirement, as evidenced by the clear and unequivocal text of Article 37, does not arise when there is some change in coverage or any other portion of an existing health insurance policy. Rather, this requirement applies when there is a change to a *new* health insurance plan. Where relevant, it reads as follows:

> In the event that the current medical plan ceases to be provided, the Company shall contract a new health insurance plan which coverage shall be similar or better than the current health insurance plan, which shall be notified and ratified by the Union.

Pursuant to the above, the notice and ratification requirements are triggered when: (i) the current medical plan ceases to be provided and (ii) when the Employer contracts a new health insurance plan. Since the 2024 health insurance ceased to be provided, and the Employer offered a "new" health insurance plan for 2025, the notice and ratification requirements became applicable.

Per Stipulated Fact No. 1, the Employer had the option to renew the 2024 health insurance policy for the year 2025 but refused to do so. [**Exhibit 10, p. 4, ¶1**] Upon the Employer's refusal to renew this policy, the health insurance plan "ceased to be provided." Therefore, the Employer was contractually beholden by Article 37 to (i) obtain a "new health insurance plan" that was "similar or better" than the 2024 health insurance plan and (ii) to notify this new plan to the Union. Notwithstanding, per Stipulated Fact No. 2, the Employer "unilaterally" changed the health insurance policy. [**Exhibit 10, p. 5, ¶2**]

Simply put, Article 37's requirements that the Employer obtain a new policy "similar or better" to the current policy and that the new policy be ratified by the Union exist precisely to address the events that led to this matter in the first place. By allowing the Union a choice to ratify the new policy, it really allows the Union a choice to decide whether the new policy is effectively similar or better than the bargained and agreed-upon policy.

By dispensing with these requirements in this case, the Award declared this contractual process to be dead letter. The arbitrator thus modified the 2024 CBA, in

disregard of Article 39, Section 10 which expressly left her without any "authority to amend [the 2024 CBA], add to it, remove from it, or modify it in any way."

Moreover, the Arbitrator's unilateral modification of the 2024 CBA not only directly contravenes express prohibitions therein but also runs afoul of Section 8 of the National Labor Relations Act. Specifically, Section 8 provides that the parties to an effective CBA may not "terminate or modify such contract" during its lifetime. 28 U.S.C. § 158(d).

The NLRB has stated that the duty to bargain in good faith mandates the parties to respect the terms of an existing CBA, unless it obtains the other party's consent to a modification. Dahl Fish Co., 279 N.L.R.B. 1084, 1094 (1986). In so stating, the NLRB concluded that the law does not allow unilateral midterm modifications of a CBA. Oak Cliff-Golman Baking Co., 207 N.L.R.B. 1063, 1064 (1973). Unilateral modifications are disallowed, even if driven by economic necessity and intended to serve "a desirable economic objective." Id. Therefore, the Award not only exceeded the scope of the authority delegated to the Arbitrator but also ran afoul of the NLRA.

### d. The Award permits the Employer to unilaterally modify the terms and conditions of employment, without first resorting to bargaining.

Aside from its prohibition of unilateral changes to an existing CBA, Section 8 also requires an employer and a Union "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Indeed, a refusal to bargain constitutes an unfair labor practice. 29 U.S.C. § 158(a)(5) & (b)(3). Therefore, an employer must provide the union with adequate notice,

an opportunity to bargain, and must also "bargain to impasse" before unilaterally changing the terms and conditions of employment. Pan Am. Grain Co. v. NLRB, 558 F.3d 22, 26 (1st Cir. 2009) & Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R. v. NLRB, 414 F.3d 158, 165 (1st Cir. 2005) (citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991)).

Employee health insurance programs are mandatory subjects of bargaining. W. W. Cross & Co. v. NLRB, 174 F.2d 875, 878 (1st Cir. 1949). Therefore, an employer's unilateral actions to change or revoke health insurance benefits violates the duty to bargain. See Beitler-McKee Optical Co., 287 N.L.R.B. 1311, 1312 (1988) (a company's unilateral revocation of family health insurance benefits violates its duty to bargain). In fact, when an employer unilaterally raises employees' health insurance contributions, the NLRB has held such behavior to constitute an unfair labor practice. Circuit-Wise, Inc., 308 N.L.R.B. 1091, 1096 (1992). In fact when, as here, the employer does not "satisfy its obligation to provide the Union with timely notice and a meaningful opportunity to bargain over the change in employment conditions [but instead] present[s] the health plan changes to the Union as a fait accompli," the employer violates "Section 8(a)(5) and (1) by unilaterally implementing the health plan changes." Brannan Sand & Gravel Co., 314 N.L.R.B. 282, 282 (1994)

Notwithstanding the above, the arbitrator found that the Union had implicitly waived its right to bargain on any substantial change, benefits, copays, deductibles, and employee contributions to health insurance plans, since there is no express language in

Article 37, as amended and included in the 2024 CBA. The arbitrator's conclusion misapplies the waiver analysis and applicable law.

A waiver of a statutory right to bargain over mandatory subjects requires a "clear and unmistakable relinquishment of that right." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 702 (1983). Waiver can occur due to express contract language, the parties' conduct (past practice, bargaining history, and action or inaction), or by a combination of the two. Chesapeake & Potomac Telephone Co. v. NLRB, 687 F.2d 633, 636 (2d. Cir. 1982).

In this case, the arbitrator concluded there to be waiver, because the Union acceded to the Employer's request to "strike" the copays and deductibles table in the 2017 version of Article 37, when negotiating the 2024 CBA. However, that action by itself does not constitute a "clear and unmistakable" waiver. Instead, the contract language must have been specific—the 2024 CBA was not—or the issue must have been fully discussed, consciously explored, and the waiving party then yielded its interest in the matter. Trojan Yacht, 319 NLRB 741, 742 (1995).

Although the issue was fully discussed and subject to bargaining during the 2024 CBA negotiations, the Union did not yield any interest in the matter. Indeed, Rivera and Soto both testified—and the Employer offered no testimony contrary to their positions— that the sole reason the Union acceded to striking the table from Article 37 was because they had been furnished with documents for the 2024 health insurance plan summarizing employer contributions, copays, deductibles, among other points. They evaluated these

documents with the table and conceded that the 2024 health insurance plan was substantially similar to the former.

Indeed, precisely because the Union was led to believe that the 2024 health insurance plan, with its contributions, deductibles, copays, and other terms, would remain effective for the duration of the 2024 CBA, as bargained, the Union did not insist on any additional language. Simply put, the Union yielded no interest, it simply acted as if the parties' bargaining adequately protected its existing interests. The Union could not have predicted that the Employer would renege on this position less than a year into the 2024 CBA and would fail to comply with its other obligations under Article 37 of the 2024 CBA. The Award's finding of waiver under these circumstances is patently untenable under applicable law.

Simply put, the Union waived nothing. And because it waived nothing, there is no behavior attributable to the Union that would excuse the Employer's flagrant breach of its duty to bargain. Because its unilateral imposition of changes to Union employees' health insurance policy breached this duty to bargain, the Award's conclusion that there was no breach of the 2024 CBA is clearly erroneous, contrary to law, repugnant to the NLRA, and warrants vacatur of the Award.

## VI.    CONCLUSION & PRAYER

**WHEREFORE**, the Union respectfully asks this Court to enter Judgment for the Union vacating the Award and to remand this matter to the Bureau for entry of an Award in favor of the Union granting the following relief:

23

- Ordering the Employer to restore the *status quo* that existed prior to its unilateral changes;

- Ordering the Employer to strictly observe Article 37;

- Reimburse all Union employees for all amounts incurred as a direct consequence of its unilateral changes;

- Make Union employees whole for any other loss that resulted from the Employer's unilateral changes, and

- All other appropriate relief.

**RESPECTFULLY SUBMITTED**, in Guaynabo, Puerto Rico, this 30th day of May 2025.

**I HEREBY CERTIFY** that a copy of this Petition has been sent by certified mail and electronic mail to **Arbitrator Yolanda Cotto Rivera**, Department of Labor and Human Resources, Bureau of Conciliation and Arbitration, P.O. Box 195540, San Juan, PR 00919-5540 (9589 0710 5270 2146 5791 33) (ycotto@trabajo.pr.gov) and the Employer's attorney, **Angel Omy Rey Seijo, Esq.**, at 150 Tetuán Street, Old San Juan, PR 00901 (9589 0710 5270 2146 5791 40) (rey@aorlawpr.com; arey@pg.legal).

*s/ Alexandra Sánchez-Mitchell*
Alexandra Sánchez-Mitchell
USDC-PR No. 305,109

*s/Miguel Simonet-Sierra*
Miguel Simonet-Sierra
USDC-PR No. 210,102

*s/Richard J. Schell*
Richard J. Schell
USDC-PR No. 305,811

24

**MONSERRATE SIMONET & GIERBOLINI, LLC**
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968
Tel.: 787 620-5300
Fax: 787-620-5305
Email: msimonet@msglawpr.com
         asanchez@msglawpr.com
         rschell@msglawpr.com

*Attorneys for Plaintiff Unión de Periodistas, Artes Gráficas y Ramas Anexas*